FILED
COURT OF APPEALS
DIVISION II

2014 APR 22 AM 8: 37

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 44026-1-II |
| Appellant/Cross-Respondent, | |
| v. | |
| TERESA LYNN CLINE, | PUBLISHED OPINION |
| Respondent/Cross-Appellant. | |

HUNT, P.J. — The State of Washington appeals the superior court's order granting Teresa Lynn Cline's *Knapstad*[1] motion and dismissing without prejudice the first degree custodial interference charge against her. The State argues that the superior court erred in concluding as a matter of law that there was no material dispute that Cline had intentionally taken the child with intent to deprive the child's father of contact for a "protracted period" (here, a full weekend) for purposes of the custodial interference statute.[2] Cline cross-appeals, arguing that, if we agree with the State, the State failed to establish a question of fact about whether she took the child with intent to deprive the father of contact. Holding that, under the circumstances here, a weekend may constitute a "protracted period" for a 14-month-old child within the meaning of RCW 9A.40.060(3), we reverse and remand for trial.

---

[1] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

[2] RCW 9A.40.060(3).

## FACTS

### I. CUSTODIAL INTERFERENCE

Joel Gavino and Ranee Cline are BG's[3] biological parents; Teresa Lynn Cline is Ranee Cline's[4] mother and, thus, BG's maternal grandmother. On June 6, 2012, when BG was almost 14 months old, the Department of Child and Family Services held a "Family Team Decision Meeting" with Gavino, Ranee, and other family members about BG's supervision and safety. Clerk's Papers (CP) at 20. This meeting resulted in a safety plan, which provided that BG would live with Gavino, that Ranee could have only supervised visits with BG because of her drug and/or methadone use, and that relatives could supervise these visits.

After this June 6 meeting, Cline and her mother, Rosemary Cline (BG's great grandmother) were apparently engaged in an ongoing dispute with Gavino about visitation with BG. Gavino refused Rosemary's request to take BG camping at Silver Lake on Father's Day weekend. On June 15, the Friday of Father's Day weekend, Child Protective Services (CPS) worker Tarassa Wiper conducted a home visit at Gavino's residence. Gavino expressed concern about the relatives' "reliability and trust worthiness" as supervisors for Ranee's visits with BG. CP at 20. Cline and Ranee arrived to pick up some of Ranee's personal items, and Ranee "request[ed] visitation." CP at 20. Wiper arranged for Ranee to have visitation with BG that Sunday evening with Gavino supervising.

---

[3] To provide some confidentiality, we order that initials be used in the body of the opinion to identify the juvenile involved.

[4] Because several individuals involved in this case share Teresa Cline's last name, we refer to Teresa Cline's relatives by their first names to avoid confusion. We intend no disrespect.

At some point after Ranee and Gavino arrived, one of Gavino's neighbors saw Cline leave the house, move her car further down the street, return inside the house, walk back out of the house with BG about three minutes later, run from the house to her car, and drive away with BG. When they realized BG was gone, Gavino and Ranee unsuccessfully tried to contact Cline; and Gavino called 911. When the deputies arrived, Ranee denied having given Cline permission to take BG, and she supplied a written statement to that effect. Ranee also told the deputies that her grandmother, Rosemary, had requested visitation with BG that weekend to go camping at Silver Lake.

Meanwhile, Gavino's aunt, Diana Waadevig, engaged in a text message conversation with Rosemary. Waadevig texted Rosemary, "You might want to call [Cline] and tell her to return [BG] before she gets into trouble." CP at 35. Rosemary responded, "[T]his would of not came [sic] to this if you would of [sic] just let ranee [sic] and the family see him once in a while." CP at 37.

Deputies located Rosemary, Cline, Ranee, and BG at a campground near Silver Lake. Ranee told one deputy that she had not contacted the police to report that she had located BG because she was waiting for her phone to charge; despite her earlier denial, Ranee admitted that she had told Cline to take the child. After advising Cline of her *Miranda*[5] rights, the deputies questioned her. Cline told the deputies that she and Ranee had been upset to find someone from CPS at Gavino's house when they arrived and that Ranee had asked her (Cline) to take BG. Cline also provided the following written statement: "Ranee and I went to get cust[o]dy off [sic] [BG]." CP at 21. The deputies arrested Cline.

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## II. PROCEDURE

The State charged Cline with first degree custodial interference under RCW 9A.40.060(3). Cline's attorney filed a *Knapstad* motion, arguing there was no evidence that Cline had intended to deny access to BG or that she had intended to hold BG permanently or for a protracted period of time. In support of this motion, Cline filed the deputies' probable cause statements, documents supporting the probable cause statement, and three new affidavits from persons who had witnessed or played a part in Cline's taking BG.

The first affidavit was from Jamie Nance, a Parent-Child Assistance Program employee, who had been at Gavino's home on June 15 looking for Ranee to discuss a drug treatment program. Nance had overheard Ranee tell Cline "to take [BG] and get out of there." CP at 76. Ten to fifteen minutes later, after Nance had returned to her office, Ranee and Gavino arrived at Nance's office, where Ranee asked Nance whether she had seen Cline because "[Cline] took off with the baby." CP at 76. Having earlier heard Ranee tell Cline to take BG, Nance did not believe Ranee's statement.

The second affidavit was from Ranee. Ranee asserted that after she saw signs of drug use in Gavino's house, she told Cline to take BG "home." CP at 79. She believed that as long as her mother was present to supervise her (Ranee) with BG, it was approved under the safety plan. Ranee admitted that she had initially lied about not having told her mother to take BG; but she claimed that she had lied because Gavino was angry and she feared for her safety. Ranee stated that after a deputy dropped her at a friend's house, Rosemary had contacted her (Ranee), told her that she (Rosemary) was with Cline and BG, and invited her (Ranee) to go to Silver Lake with them; Ranee had accepted the invitation. Ranee further asserted that (1) she had intended to call

the sheriff's office to let them know she was with BG, but the deputies had arrived about 10 minutes after she got to Silver Lake and she did not have time to call; and (2) when the deputies arrived, she had told them "the truth" about having given Cline permission to take BG because the deputies had arrested Cline. CP at 80.

The third affidavit was from Rosemary. Rosemary stated that on the afternoon of June 15, she had called Cline and invited her to go to dinner with the family at the lake. Cline had accepted the invitation but told Rosemary that she was with BG at home, waiting for Ranee. Rosemary had then contacted and picked up Ranee, Cline, and BG and had taken them to the lake. Rosemary asserted that she had intended to bring everyone back to Cline's house after dinner, consistent with their family custom.

The State responded to Cline's motion that, taken in the light most favorable to the State, her submissions (1) established a question of fact about whether Cline had taken BG from Gavino for a "weekend-long camping trip," CP at 84; and (2) created a question of fact for the jury about whether the State could prove the "'protracted period" element of custodial interference. CP at 84 (quoting RCW 9A.40.060(3)).

The trial court granted Cline's *Knapstad* motion and dismissed the charge without prejudice. In its written order, the trial court stated:

> After considering all the evidence presented to this court at the time of the hearing of the Knapstad[(sic)] Motion in this matter, *it does appear that the State may have sufficient evidence to show that the defendant had the intent to deprive the father of the child of contact with the child for some period of time.* However, the statute requires that in order to be able to prove the charge of Custodial Interference in the First Degree against the defendant in this matter, the State would need to prove that the defendant intended to deprive the father of contact with the child either permanently, or for a protracted period of time. The State's position is that the defendant intended to deprive the father of contact with the child for a weekend. *I would find as a matter of law that two days, in the factual*

> *circumstances presented by the prosecuting attorney, and taking the facts in the light most favorable to the State, can not constitute "a protracted period."*
>
> Consequently, I am granting the defendant's Knapstad[(sic)] Motion, and the charge of Custodial Interference in the First Degree presenting pending against the defendant is dismissed without prejudice.

CP at 93-94 (emphasis added).

The State appeals. Cline cross-appeals.

## ANALYSIS

### I. STATE'S APPEAL

The State argues that the trial court erred in concluding that Cline's taking BG for a weekend was not "a protracted period" as used in the first degree custodial interference statute, RCW 9A.40.060(3). Br. of Appellant at 7. We agree with the State. This issue is one of first impression in Washington.

### A. Standards of Review

We review de novo a trial court's dismissal of a criminal charge under *Knapstad. State v. Conte,* 159 Wn.2d 797, 803, 154 P.3d 194, *cert. denied,* 552 U.S. 992 (2007).

> Under *Knapstad,* a defendant may make a pretrial motion to dismiss a charge and challenge the State's ability to prove all of the elements of the crime. The trial court has the inherent power to dismiss a charge when the undisputed facts are insufficient to support a finding of guilt. *Knapstad,* 107 Wn.2d at 351. The court must decide "whether the facts which the State relies upon, as a matter of law, establish a prima facie case of guilt." *Knapstad,* 107 Wn.2d at 356-57.

*State v. Montano,* 169 Wn.2d 872, 876, 239 P.3d 360 (2010). We will uphold the trial court's dismissal of a charge under *Knapstad* if no rational finder of fact could have found beyond a

reasonable doubt the essential elements of the crime. *State v. Snedden*, 112 Wn. App. 122, 127, 47 P.3d 184 (2002), *aff'd*, 149 Wn.2d 914, 73 P.3d 995 (2003).[6]

We review questions of statutory interpretation de novo. *State v. Bunker*, 169 Wn.2d 571, 577-78, 238 P.3d 487 (2010). We interpret statutes to give effect to the legislature's intentions, beginning by examining the statute's plain language. *Bunker*, 169 Wn.2d at 578. In the absence of statutory definitions, we look to standard dictionary definitions. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002) (citing *State v. Sullivan*, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001)).

B. Definition of "Protracted Period"

RCW 9A.40.060(3) provides:

> A parent or other person acting under the directions of the parent is guilty of custodial interference in the first degree if the parent or other person intentionally takes, entices, retains, or conceals a child, under the age of eighteen years and for whom no lawful custody order or parenting plan has been entered by a court of competent jurisdiction, from the other parent with intent to deprive the other parent from access to the child permanently or *for a protracted period*.

(Emphasis added). Neither this statute and nor the rest of chapter 9A.40 RCW, however, define a "protracted period"; and no case law of which we are aware expressly defines a minimum period of time in this context. Thus, we use statutory interpretation principles to determine its meaning.

According to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1826 (definition 2) (1993), to "protract" means "to draw out or lengthen in time or space: CONTINUE, PROLONG."

---

[6] *See also State v. Olson*, 73 Wn. App. 348, 357 n.6, 869 P.2d 110 (1994) (noting similarity between standards of review for *Knapstad* motion and challenge to the sufficiency of the evidence), *review denied*, 124 Wn.2d 1029 (1994).

Because the term "prolonged" is a relative term, the dictionary definition alone does not answer the question of whether a prolonged period can, in some circumstances, be as short as a weekend in the context before us here. Thus, we turn to case law for clarification.

Washington courts have addressed first degree custodial interference cases involving time periods significantly longer than the weekend at issue here. But these cases neither address the meaning of "protracted period" nor establish the *minimum* amount time needed to constitute a "protracted period" in this statutory context.[7] The shortest time period discussed in any state or federal custodial interference case we could locate was an eight-day period; but even that case did not focus on the duration of the interference. *See People v. Obertance*, 105 Misc. 2d 558, N.Y.S.2d 475 (1980) (addressing a vagueness challenge to the "protracted period" element).[8] Other domestic relations and criminal statutes and cases also use the phrase "protracted period"; but similarly they do not define the minimum length of a "protracted period," and they involve

---

[7] *State v. Veliz*, 176 Wn.2d 849, 851-52, 298 P.3d 75 (2013) (defendant charged six days after taking child, whom defendant did not return for four months); *State v. Justesen*, 121 Wn. App. 83, 84-85, 86 P.3d 1259 (child concealed for 18 months), *review denied*, 152 Wn.2d 1033 (2004); *State v. Lund*, 63 Wn. App. 553, 555-56, 821 P.2d 508 (1991) (husband took child out of state with intent to keep the child to obtain a marital reconciliation, child recovered after 26 days), *review denied*, 118 Wn.2d 1028 (1992).

[8] *See also State v. Luckie*, 120 N.M. 274, 278-79, 901 P.2d 205 (1995), *cert. denied*, 120 N.M. 184 (1995) (vagueness challenge to "protracted period" language in custodial interference statute) (citing *Obertance*, 432 N.Y.S.2d at 476).

contexts quite distinct from the first degree custodial interference charged here.[9] Thus, these cases offer little guidance.

Nevertheless, although none of these cases or statutes expressly provide that a "protracted period" can be as short as a weekend, they do demonstrate that the meaning of "protracted period" is highly context-dependent. Some courts, for example, have defined "protracted period" in the custodial interference context as "'a lengthy or unusually long time *under the circumstances*.'" *State v. Luckie*, 120 N.M. 274, 279, 901 P.2d 205 (1995), *cert. denied*, 120 N.M. 184 (1995) (emphasis added) (quoting *Obertance*, N.Y.S.2d at 476). We further note that this context-dependent definition is consistent with our legislature's express purpose in promulgating the custodial interference statute: to protect children and custodial parents from non-custodial parental kidnapping. *See* 1984 FINAL LEGISLATIVE REPORT, 48th Wash. Leg., at 128-29. Against this backdrop, we adopt "a lengthy or unusually long time under the circumstances" as a reasonable definition of "protracted period" for purposes of Washington's first degree custodial interference statute, RCW 9A.40.060(3).

---

[9] *See* RCW 26.09.191(3)(f) (domestic relations statute allowing court to impose restrictions in parenting plan if "[a] parent has withheld from the other parent access to the child for a protracted period without good cause"); RCW 26.09.410(2) (domestic relations statute defining "relocate" as "a change in principal residence either permanently or for a protracted period of time"); *State v. Rotko*, 116 Wn. App. 230, 245, 67 P.3d 1098 (2003) (criminal mistreatment case addressing whether the "protracted nature of the offense" was "a factor necessarily included in the crime itself" and therefore could not be considered an aggravating sentencing factor when abuse occurred over child's entire 11-month lifetime); *State v. Vaughn*, 83 Wn. App. 669, 680, 924 P.2d 27 (1996) (addressing sophistication and planning exceptional sentencing factor, describing 11-month period that child rapist/kidnapper spent in victim's neighborhood before committing the crime as a "protracted period"), *review denied*, 131 Wn.2d 1018 (1996); *State v. Ross*, 71 Wn. App. 556, 861 P.2d 473, 883 P.2d 329 (1993), *review denied*, 123 Wn.2d 1019 (1994) (murder case discussing evidence of "protracted" struggle in context of deliberate cruelty aggravating sentencing factor).

C. Application of "Protracted Period" Definition

Applying this newly adopted definition, we next determine if the State established a question of fact about whether Cline intended to withhold BG for a "protracted period" in the context of the circumstances of this case. We hold that it did.

The statutory purpose of protecting the child undergirds any determination of whether a weekend was a "protracted period" under the circumstances. Here, the child was especially vulnerable, a baby less than 14 months old. Gavino, the parent with custody, was engaged in a long-running argument with members of the mother's family over visitation. Ranee, the child's mother, was allowed only supervised visitation because of her drug use. And Cline took the baby surreptitiously at Ranee's request, without Gavino's knowledge or consent. These circumstances showed instability in the child's care. Against this backdrop, a weekend *could* constitute "a protracted period" of time for a baby as young and dependent as BG. And a jury should decide whether Cline violated the statute under the facts and circumstances of this case.

Accordingly, we hold that (1) the State provided sufficient evidence to support this "protracted period" element, and (2) the trial court should have denied Cline's *Knapstad* motion to dismiss the first degree custodial interference charge before trial.

II. CLINE'S CROSS-APPEAL

In her cross-appeal, Cline argues that even if we hold that the State established this "protracted period" element, the evidence was not sufficient to show that she intended to deprive Gavino of access to BG. This argument fails.

Cline first asserts that there is no proof that she intended to deprive Gavino of access to BG because "Ranee, who clearly was the parent of the child who gave the child to [Cline], had

the legal right to do so." Br. of Resp't/Cross Appellant at 12-13. Cline misreads RCW 9A.40.060(3), which expressly applies to a person who takes a child *under the direction of a parent* with intent to deprive *the other parent* of access to the child ("for whom no lawful custody order or parenting plan has been entered by a court of competent jurisdiction"). RCW 9A.40.060(3). Because Ranee did not have the right to deprive Gavino of his access to BG,[10] that Cline acted under Ranee's direction did not absolve her of custodial interference as charged under this statute.

Cline next argues that the evidence showed only that Rosemary, not Cline, intended to take the child for the weekend. Again, taken in the light most favorable to the State, the evidence shows that (1) Rosemary requested the child for a family gathering that weekend, (2) Rosemary's response to Waadevig's text advising Rosemary to call Cline and to tell Cline to return the child suggested that Rosemary was aware of Cline's actions, and (3) the deputies later located Cline and BG at the family gathering at the lake. This evidence was sufficient to establish a question of fact about whether Cline intended to take deprive Gavino of his access to

---

[10] Contrary to Cline's argument, we stress that Ranee's independent legal right and access to BG were irrelevant. In addition, Cline incorrectly asserts that the evidence that Ranee "gave" her BG was "uncontroverted." Br. of Resp't/Cross Appellant at 13. Ranee's written and oral statements immediately after Cline took BG directly conflict with Cline's later statements and other evidence suggesting that Ranee "gave" BG to Cline.

No. 44026-1-II

BG that Father's Day weekend.

We reverse the superior court's dismissal of the custodial interference charge against Cline and remand for trial.

_Hunt, J._
Hunt, P.J.

We concur:

_Bjorgen, J._
Bjorgen.

_Maxa, J._
Maxa, J.