IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35627-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARY ANNVALEE FAUCETT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — From a plea of guilty to manslaughter, Mary Faucett appeals the

trial court's earlier denial to dismiss homicide charges, which motion she based on an

agreement with the State for her to disclose information. We refuse to address the

appeal, because the guilty plea waived the right to challenge the motion's denial.

FACTS

This prosecution of Mary Faucett arises from the December 3, 2014, shooting

death of Lorenzo Fernandez by DeShawn Anderson. Anderson believed Fernandez to be

a member of a gang responsible for shooting his friend. On the night of the death,

Faucett telephoned Fernandez and lured him, with the pretext of sexual relations, to the

Pasco Stonegate Apartments, where the homicide occurred. Faucett called Fernandez with the cellphone of her husband, Kenyatta Bridges. Bridges is DeShawn Anderson's cousin. Luis Amaya and Raquel Acosta rode in the car that took Bridges, Anderson, and Faucett to the Stonegate Apartments.

The recorded statements provided by Mary Faucett to law enforcement hold more importance than the underlying facts. On December 11, 2014, Pasco Detective Corey Smith detained Mary Faucett for questioning. Faucett provided Smith limited information. On December 15, 2014, the State charged Mary Faucett with rendering criminal assistance in the first degree as a result of the shooting of Lorenzo Fernandez. She bailed herself out of the Franklin County jail.

On the morning of December 25, 2014, law enforcement rearrested Mary Faucett and arrested her husband Kenyatta Bridges in Spokane. Pasco officers transported Bridges to Pasco. Officers questioned Bridges. Faucett posted bail and left jail. On the night of December 26, Faucett telephoned Detective Anthony Aceves to inquire as to what, if anything, Bridges told the officers about the homicide. Detective Aceves replied that he would not disclose any comments uttered by Bridges. A disappointed Faucett ended the call.

On December 30, 2014, Mary Faucett approached Detective Anthony Aceves, after the arraignment of Kenyatta Bridges, and asked Aceves as to the current location of money on Bridges' person at the time of his arrest. During the conversation, Faucett

2

volunteered to submit to an interview by Detective Aceves. At the beginning of the interview, Faucett stated that she had hoped to be an attorney and that she had begun an investigation to determine what evidence law enforcement had collected implicating Kenyatta Bridges and herself with the murder of Lorenzo Fernandez by DeShawn Anderson. Aceves astutely concluded that Faucett sought the interview to gain information from him, not vice versa.

During the December 30 interview, Detective Anthony Aceves commented to Mary Faucett that Faucett repeatedly lied during her December 11 interview and that she now needed to tell the truth about her involvement in the murder. Faucett again denied any involvement in the homicide. Later, however, Faucett conceded that she called Lorenzo Fernandez and lured him under false pretenses to the Stonegate Apartments, the locus of the killing. During the interview, Faucett refused to name any other persons involved in the murder. She stated she did not know if her husband, Kenyatta Bridges, was present at the crime scene. Detective Aceves later determined Faucett's last comment to constitute a lie. Aceves asked Faucett if she saw DeShawn Anderson within two hours of the murder. Faucett denied such contact. Based on earlier conversations with Anderson and Bridges, Anthony Aceves knew the response to be false. Based on his investigation, Aceves knew that Faucett rode with Kenyatta Bridges and DeShawn Anderson to the Stonegate Apartments shortly before the murder and that Faucett lured Lorenzo Fernandez to the location.

3

During the December 30 interview, Detective Anthony Aceves questioned Mary Faucett as to the location of Kenyatta Bridges' cellphone at the time of the killing. Faucett stated that Bridges did not possess his cellphone at the time. She refused to disclose who possessed the phone then. Aceves believed that Faucett possessed the phone. Detective Aceves considered other comments by Faucett during the December 30 recorded statement to be prevarications.

During the December 30 interview, Mary Faucett told Detective Anthony Aceves that she told the truth but withheld some percipient information because she did not know what Kenyatta Bridges intended to do with his life. Faucett repeatedly asked Aceves to disclose what Bridges told detectives. Detective Aceves refused. Faucett also inquired about the evidence law enforcement possessed concerning any role she played in Lorenzo Fernandez's death. Faucett volunteered to speak further if the State limited charges against her to the pending rendering criminal assistance charge. Aceves stated he held no authority to enter a plea agreement.

During the December 30 recorded interview, Detective Anthony Aceves left the interview room to speak with the prosecuting attorney assigned to the case. Anthony Aceves returned to the room and informed Mary Faucett that the prosecutor would not enter an agreement because Faucett had yet to cooperate and provide helpful information. Faucett insisted that she possessed information unknown to detectives. She would, however, not disclose the information without a plea agreement.

Days after the December 30 interview, Mary Faucett called Detective Anthony Aceves and questioned whether the prosecutor had changed his mind about offering her a deal. Aceves responded in the negative. Faucett then shared new information with Detective Aceves, which he relayed to the prosecuting attorney. The prosecutor gave authority to Aceves to inform Faucett that she would not be charged with murder only if she disclosed her "complete involvement" in the killing and spoke "the absolute truth." Clerk's Papers (CP) at 29. Detective Aceves relayed the prosecutor's offer to Faucett and warned her that the State would withdraw the offer if the State later discovered she omitted any information or lied. Faucett agreed to meet with Aceves on January 5, 2015.

During the January 5 interview, Mary Faucett relayed the following chain of events. On the night of the homicide, Faucett's husband, Kenyatta Bridges, drove a white Tahoe, in which Faucett, DeShawn Anderson, Raquel Acosta, and Luis Amaya were passengers. On their path to a Rite Aid store in Pasco, Anderson observed Lorenzo Fernandez's vehicle parked at an Albertsons store. Bridges drove to Rite Aid where Acosta and Amaya entered the store. Anderson saw Fernandez's vehicle leaving Albertsons, and he directed Bridges to follow the car. Bridges left Amaya and Acosta at Rite Aid and followed Fernandez's vehicle to a 7-Eleven store where Anderson intended to shoot Fernandez.

Mary Faucett continued with her narrative during the January 5 interview. According to Faucett, she exited the Tahoe and entered the 7-Eleven store to prevent

5

DeShawn Anderson from shooting Lorenzo Fernandez. Faucett deliberately exited the store at the same time Fernandez exited, and Fernandez offered her a ride. Faucett accepted and, during the brief car ride, they discussed a recent shooting, in which Fernandez revealed that his cousin was one of the victims. Faucett thought she could encourage a less volatile existence between Fernandez and Anderson if she could arrange for Fernandez and Anderson to talk. Faucett hoped Anderson would realize that both he and Fernandez lost a loved one in the recent shooting and that Fernandez was not personally responsible for the death of Anderson's friend.

According to Mary Faucett, Lorenzo Fernandez gave Mary Faucett his phone number and took her to Memorial Park. A few minutes later, Kenyatta Bridges and DeShawn Anderson arrived and the three of them reunited with Raquel Acosta and Luis Amaya. Faucett called Fernandez and told him to meet her at the Stonegate Apartments for a sexual encounter. Faucett had no intention, however, of intimate relations. Bridges drove the Tahoe to the Stonegate Apartments and parked a distance down the road. Anderson and Bridges exited the Tahoe and walked to the Stonegate Apartments while Faucett, Acosta, and Amaya stayed in the vehicle.

During the January 5 interview, Mary Faucett disclosed that, ten minutes after DeShawn Anderson and Kenyatta Bridges left the vehicle, Faucett heard popping sounds. Faucett called Lorenzo Fernandez several times to determine if he was harmed. Moments later, Bridges and Anderson returned to the Tahoe. Anderson expressed dismay toward

6

Bridges because Bridges froze and failed to cover Anderson during the shooting. Despite an admission during the December 30 interview, Faucett denied "luring" Fernandez to the Stonegate Apartments. She foreswore any knowledge that Bridges and Anderson intended to shoot Fernandez.

During the January 5 interview, Mary Faucett revealed two new fragments of information: (1) Raquel Acosta rode in the Tahoe along with Faucett, DeShawn Anderson, Kenyatta Bridges, and Luis Amaya earlier in the evening of December 3, and (2) the chain of events commenced when Anderson observed Fernandez's car in the Albertsons parking lot. Detective Anthony Aceves commented to Faucett that her information showed her truthfulness and cooperation because the information was previously unknown to the police.

On January 8, 2015, Detectives Anthony Aceves and Corey Smith interviewed Raquel Acosta in the presence of her attorney. Acosta described how she and Luis Amaya rode in the Tahoe driven by Kenyatta Bridges on the night of December 3. Mary Faucett and DeShawn Anderson were passengers in the car. Acosta overheard Anderson remark about shooting someone that night. Acosta also overheard Faucett, Anderson, and Bridges laugh because Lorenzo Fernandez erroneously thought he would receive "p****" that night from Faucett. CP at 36. Faucett claimed to have given Fernandez a false name.

Based on the interview of Raquel Acosta, Detective Anthony Aceves concluded that Mary Faucett had still withheld the truth. On February 5, 2015, the State amended the information against Faucett to add, to the previous charge of rendering criminal assistance, charges of conspiracy to commit murder in the first degree and making a false statement to a public servant.

On March 3, 2015, Mary Faucett moved to enforce the immunity agreement reached between her and the State on January 5. The motion also sought to dismiss the amended information and reinstate the initial information. A grant of the motion would dismiss the charges of conspiracy to commit murder and making a false statement.

On March 4, 2015, Pasco Detectives Anthony Aceves and Jesse Romero interviewed Luis Amaya, who rode in the Tahoe on the night of December 3. According to Amaya, Kenyatta Bridges drove the car, with Mary Faucett in the front passenger seat, and he, Raquel Acosta, and DeShawn Anderson in the back seat. While the group drove in west Pasco, Mary Faucett called someone and asked the recipient of the call:

"Where you at? Where you at, just me, my home-girl and you."

CP at 44. According to Amaya, Faucett added:

"If you can bring one of your homies too my home girl is cute."

CP at 44. When Faucett ended the call, she remarked:

"That mother f—er is stupid as hell."

CP at 44. Faucett then laughed.

8

During the March 4 interview, Luis Amaya disclosed that Kenyatta Bridges parked the Tahoe along Road 68 near the Stonegate Apartments. Minutes later, Mary Faucett received a phone call. Faucett told the caller:

"Alright, alright, alright, just go to the back by the mailboxes."

CP at 44. Faucett asked the caller if anyone accompanied him. After receiving the answer, Faucett ended the phone call, tossed the cell phone on the center console, threw up her hands and exclaimed:

"Well, he's there."

CP at 44.

According to Luis Amaya, after Mary Faucett commented that he's here, DeShawn Anderson reached into a pouch behind the front passenger seat and removed a .45 pistol. Anderson yanked the gun's slide back, leaned forward, and uttered;

"All mine, all mine, all mine, I got you Ant, I got you Ant."

CP at 44. Anderson exited the car and yelled at Kenyatta Bridges: "Come on, come on." CP at 44. A nervous Bridges stumbled from the car with a gun in his hand.

According to Luis Amaya, Kenyatta Bridges and DeShawn Anderson donned hooded jackets, walked from the Tahoe, and disappeared into the wintry night. Faucett received another phone call and, after ending the phone conversation, commented to Amaya:

"This scrap kid sounds nervous as hell."

9

CP at 44. "Scrap" is a derogatory term, in the gang universe, for a Sureño gang member.

CP at 44. Seconds later, as Amaya placed a marijuana joint to his lips, he heard several

booming sounds followed by a loud bang. Faucett sighed: "Ah, f***." CP at 44. Amaya

stated Faucett did not appear surprised or shocked by the sounds.

## PROCEDURE

We return to Mary Faucett's motion to enforce the January 5, 2015 immunity

agreement. On March 10, 2015, the trial court denied Faucett's motion, which it

formalized by an order filed July 25, 2017. The court found that Faucett's statements on

December 30 and January 5 contradicted the truth uttered by Raquel Acosta and Luis

Amaya.

In August 2017, the State and Mary Faucett reached a plea agreement. Under the

agreement, the State amended its information to only charge manslaughter in the first

degree. Pursuant to the agreement, the State requested a sentence of 130 months, despite

the standard range being 86 to 114 months. Faucett pled guilty to the amended charge,

and the trial court sentenced her to 130 months of confinement.

## LAW AND ANALYSIS

### 2015 Testimony Agreement

On appeal, Mary Faucett assigns error to the March 2015 denial of her motion to

enforce the January 2015 agreement, under which the State agreed to file no homicide

10

charges. The State argues that, by pleading guilty, Faucett waived her right to challenge the trial court's decision to deny her motion. We agree with the State.

An accused's plea of guilty limits her right of appellate review. *State v. Majors*, 94 Wn.2d 354, 356, 616 P.2d 1237 (1980). A plea of guilty constitutes a waiver by the defendant of his or her right to appeal. *State v. Majors*, 94 Wn.2d at 356. A guilty plea is more than an admission of conduct; the plea stands as a conviction and nothing remains but to give judgment and determine punishment. *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).

A defendant may appeal, after a guilty plea, sentencing errors and collateral questions such as the validity of a statute, sufficiency of the information, jurisdiction of the court, or the voluntariness of the plea. *In re Personal Restraint of Schorr*, 191 Wn.2d 315, 322-23, 422 P.3d 451 (2018); *State v. Peltier*, 181 Wn.2d 290, 294-95, 332 P.3d 457 (2014). A defendant may not appeal the denial of any pretrial motions. *State v. Olson*, 73 Wn. App. 348, 353, 869 P.2d 110 (1994).

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, *he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.* He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*.

*Tollett v. Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973) (emphasis added). Mary Faucett does not challenge the sufficiency of evidence, the voluntariness of her plea, or the jurisdiction of the court.

Mary Faucett submitted a statement of additional grounds that suffers from the same defect. Faucett challenges matters outside the realm of what may be challenged following a guilty plea.

Legal Financial Obligations

On October 30, 2018, Mary Faucett filed a motion with this court to strike the $200 criminal filing fee and $100 DNA collection fee from her judgment and sentence pursuant to House Bill 1783 and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018). Faucett filed her opening brief on June 7, 2018, the day House Bill 1783 became effective. The state Supreme Court decided *Ramirez* in September 2018. Until *Ramirez*, accused did not know if the statutory amendments from House Bill 1783 would be applied to cases on appeal. As a result, Faucett was not able to address, in her opening brief, the arguments she now forwards in her motion.

The State opposes this court's accepting Mary Faucett's motion as a supplemental brief by noting that Faucett cites no court rule that permits her to assign new errors. The State adds that Faucett could have moved to amend her brief before August 1 when the State filed its respondent's brief. As earlier mentioned, however, the clarifying decision regarding the application of the changes did not become published until September. As

addressed in *Ramirez*, the timing of the amendments and of the court's decision prevented defendants from being able to raise these arguments in their briefs. Therefore, we accept Faucett's motion as a supplemental brief.

Sentencing matters may be challenged after a guilty plea. *In re Personal Restraint of Schorr*, 191 Wn.2d at 322-23 (2018). While the DNA collection fee of $100 was previously a mandatory legal financial obligation, under the new amendments of House Bill 1783, the fee is no longer mandatory if a person's DNA has already been collected. *State v. Ramirez*, 191 Wn.2d at 747. The $200 criminal filing fee may also not be imposed on indigent defendants. *State v. Ramirez*, 191 Wn.2d at 747. Because Faucett's case was not yet final when House Bill 1783 was enacted, Faucett may benefit from the statutory changes.

Mary Faucett had previously been convicted of the felony second degree theft. RCW 9A.56.040(2). Thus, the DNA fee should be struck.

The State argues that Mary Faucett shows no indigency for purposes of waiving the $200 criminal filing fee. The State underlines that Faucett posted a $25,000 bond. When the trial court revoked her conditions and raised the bond amount to $150,000, she hired a private attorney. Nevertheless, during sentencing, the trial court inquired of Faucett:

> THE COURT: I guess I would hear from Ms. Faucett regarding her ability to pay additional costs.

13

> THE DEFENDANT: Currently, Your Honor, I am unable to pay it.
> THE COURT: Do you have any assets that you wish to—I guess to obtain funds to pay any of these fees?
> THE DEFENDANT: Not currently, Your Honor.

Report of Proceedings (Sept. 14, 2017) at 18. Defense counsel further informed the court that Faucett had not worked for three years and owned no assets. The sentencing court assessed Faucett approximately $24,000 in restitution.

Because of Mary Faucett's prevarication during police detective interviews, the State understandably distrusts Mary Faucett's testimony about her income and assets. The State notes that Faucett accrued income as a prostitute while on bond. We question whether money received as a Pasco prostitute suffices to pay more than living expenses, and we wish not to encourage Faucett's return to this profession. Faucett faces a huge sum of restitution to pay. On October 17, 2017, the trial court entered an order of indigency that found Faucett indigent and entitled to counsel on review at public expense. Therefore, we order the criminal filing fee struck.

## CONCLUSION

We affirm Mary Faucett's conviction for manslaughter. We remand to the trial court to strike the imposition of the $200 criminal filing fee and the $100 DNA collection fee. Faucett need not be present at any court hearing to strike these legal financial obligations.

14

No. 35627-2-III
*State v. Faucett*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, A.C.J.